# BUNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOSEPH G. O'BRIEN,                              )
                                               )
                    Plaintiff,                 )        Case No.: 2:07-cv-00986-GMN-GWF
                                               )
        vs.                                    )
                                               )        **ORDER**
UNITED STATES OF AMERICA,                      )
                                               )
                    Defendant.                 )
_____)
UNITED STATES OF AMERICA,                      )
                                               )
                    Counter-Claimant,          )
                                               )
        vs.                                    )
                                               )
JOSEPH B. O'BRIEN, MICHAEL V.                  )
VILLAMOR, DAN K. SHAW, and                     )
JAMES R. VAN WOERKOM,                          )
                                               )
                    Counter-Defendants.        )
_____)
DAN K. SHAW,                                   )
                                               )
                    Counter-Claimant,          )
                                               )
        vs.                                    )
                                               )
UNITED STATES OF AMERICA,                      )
                                               )
                    Counter-Defendant.         )
_____)

## __INTRODUCTION__

Before the Court is Defendant / Counter-Claimant / Counter-Defendant United States of America's (hereinafter "the United States") Motion for Summary Judgment against Dan K. Shaw (ECF No. 84).  Counter-Claimant / Counter-Defendant Dan K.

Shaw (hereinafter "Mr. Shaw") filed a Response on June 21, 2010 (ECF No. 93). The United States filed a Reply on July 20, 2010 (ECF No. 98).

## FACTS AND BACKGROUND

This action arises out of the failure of VSS Enterprises, LLC ("VSS") to collect, properly account for, and remit to the United States Internal Revenue Service the federal income taxes and social security taxes withheld from its employee's wages for the period from July 1, 2002 through June 30was, 2003.

The instant suit was filed by Plaintiff Joseph G. O'Brien, Director of Finance for VSS, against Defendant the United States (Complaint, ECF No. 1). The United States answered and counterclaimed against Mr. O'Brien, as well as against Mr. Villamor, Mr. Shaw, and Mr. VanWoerkom (United States Answer and Counterclaims, ECF No. 17). Mr. O'Brien and Mr. VanWoerkom reached a settlement agreement with the United States (ECF No. 103 & 104) and Default Judgment was entered against Mr. Villamor (ECF No. 115). Mr. Shaw and the United States are the only remaining parties to this suit. The United States filed the instant motion for summary judgment against Mr. Shaw on April 30, 2010 (ECF No. 84).

Dan Shaw, Michael Villamor, and Gregg Schatzman formed VSS in 1999 for the purpose of acquiring and managing casino properties. (Darmstadter Decl. Ex. 7, Annual Financial Statement Arthur Andersen pg. 6, note 1, ECF No. 88-10; Darmstadter Decl. Ex. 8, O'Brien Dep. pg. 98–100, ECF No. 88-11). In July 1999, VSS entered into an agreement to purchase the Showboat Hotel, Casino and Bowling Center for $23.5 million. (Darmstadter Decl. Ex. 16, Villamor BK Decl. ¶ 8, ECF No. 88-19). The property was renamed the Castaways Hotel, Casino, and Bowling Center (hereinafter "the Castaways"). (*Id.*).

In order to own and operate the Castaways, VSS and its individual members had

to obtain a gaming license from the Nevada State gaming authorities. (Darmstadter Decl. Ex. 5-1–5-3, Shaw Dep. p. 102, ECF No. 88-6–88-8; N.R.S. § 463.170(6)). Pursuant to Nevada Gaming Statutes, to obtain a license to operate a gaming establishment, the Commission must be satisfied that the applicant has "adequate business probity, competence, and experience, in gaming or generally" and that the proposed financing of the entire operation is both adequate and from a suitable source. (N.R.S. § 463.170(3)). Mr. Shaw did receive his gaming license, but when he applied for the license he answered "NO" to the question of whether he would be engaged in the management and operation of the gambling establishment. (Shaw Dep. p. 103; Kelly Decl. Ex. H, Shaw's Application for a Nevada Gaming License p. 6, ECF No. 96-15). After VSS and its member managers received their gaming licenses, VSS closed on the purchase of the Showboat for $23.5 million on March 30, 2000. (Villamor BK Decl. ¶8, pg. 3).

VSS began operating the Castaways immediately after acquisition. Mr. Villamor acted as president and CEO, Mr. Schatzman as COO and Mr. VanWoerkom as CFO. (Darmstadter Decl. VSS Brochure Ex. 2 p. 8, 12, 14, ECF No. 88-3). Mr. Shaw was not an officer of VSS, but held title of Chairman. (*Id.* at p. 10; Darmstadter Decl. Ex. 13, Shaw BK Dep. p. 7, ECF No. 88-16; Darmstadter Decl. Ex. 72, VanWoerkom Dep. p. 49, ECF No. 88-77; O'Brien Dep. p. 76). Joseph O'Brien, as the director of finance, was also part of VSS's key management. (VSS Brochure p. 23)

The Castaways experienced a downturn after the terrorist attacks of September 11, 2001. (Shaw Dep. pp. 432–46; Darmstadter Decl. Ex. 1-1–1-2, Villamor Dep. p. 153, ECF No. 88-1–88-2). In the middle of 2002, due to serious cash flow/liquidity problems, VSS was no longer able to timely pay all of its operating expenses and other financial obligations, including turning over payroll tax withholdings to the federal government. (O'Brien Dep. pp. 171–74; Villamor Dep. p. 168–69). VSS always sought to maintain

the "minimum bankroll" requirements established by the Nevada Gaming Control Board ("NGCB") during the period it was experiencing cash flow problems.[1]  (Shaw Dep. pp. 158–59; Villamor Dep. pp. 171–72; O'Brien Dep. pp. 97–98).  Thus, the minimum bankroll was never applied to pay the employment taxes because it was believed that NGCB would suspend the Castaways' gaming operations if it did not maintain minimum bankroll. (Villamor Dep. pp. 111–12).  Also, the Castaways always paid its monthly gross gaming revenue taxes to Nevada because there were concerns that VSS's gaming license would be suspended if delinquent. (*Id.* at p. 114-15, p. 167, 172, 212).

VSS became delinquent in turning over its federal employment tax withholdings starting in the third quarter of 2002 (July 1, 2002 through September 30, 2002).  VSS remained delinquent in paying said taxes through the filing of bankruptcy in June 2003. Starting in early 2003, Mr. Shaw began making short term loans or advances to VSS for operating purposes. (*See* Darmstadter Decl. Ex. 58, Transactions Reporting Form re: loans from Dan Shaw, ECF No. 88–63; Shaw Dep. pp. 160–64, 363–367; Villamor Dep. pp. 178–181).  Mr. Shaw provided these short term loans, or "weekend loans," on the condition that he would be repaid the funds by the following week. (Shaw Dep. pp. 160– 64, 202–06, 222).  Mr. Shaw lent VSS $1,244,000 from April 4, 2003 to June 9, 2003. (*See* Transactions Reporting Form re: loans from Dan Shaw).  Each loan was promptly repaid within days to Mr. Shaw without regard to debts owed to other creditors, including the IRS. (*Id.*).

Also during the time VSS was delinquent in the payment of its employment taxes, in April 2003, VSS had total deposits and credits of over $7,480,000 in its Wells Fargo

---

[1] Nevada gaming regulations require that all non-restricted licensees maintain an amount of cash on hand to reasonably protect patrons against potential gaming debts owed by the operator. *See* N.G.R. § 6.150.  Failure to maintain the minimum bankroll is an unsuitable method of operation that can result in suspension of gaming activities and disciplinary action against the operator. N.G.R. § 6.150, § 5.010.

account. (*See* Darmstadter Decl. Ex. 48, April 2003 Account Statement, ECF No. 88-53).

As of June 27, 2003, the Castaways maintained over $1.3 million in vault money,

$669,575.18 of which was held in cash. (Darmstadter Decl. Ex. 49, Minimum Bankroll

Requirements p. VSS-017-00351, ECF No. 88-54).  This money was used to maintain

minimum bankroll and was not used to satisfy, even in part, the Castaways' delinquent

payroll tax liabilities owing to the United States Internal Revenue Service at that time.

On June 27, 2003, the Castaways filed for bankruptcy. (*See* Case No. BK-S-03-

17939-LBR (Bankr. D. Nev.)).  The Castaways continued operations as a debtor in

possession until early 2004, when a creditor, Vestin Mortgage, took possession of the

property. (Villamor Dep. p. 64).  On April 3, 2006, the Internal Revenue Service made

assessments against Mr. Shaw for Civil Penalties arising from the nonpayment of taxes

by VSS in the following amounts:

| | | |
|---|---|---|
| Civil Penalty, 26 U.S.C.A. § 6672 for 3Q 2002 | 04/03/2006 | $411,644.74 |
| Civil Penalty, 26 U.S.C.A. § 6672 for 4Q 2002 | 04/03/2006 | $880,783.58 |
| Civil Penalty, 26 U.S.C.A. § 6672 for 1Q 2003 | 04/03/2006 | $732,232.93 |
| Civil Penalty, 26 U.S.C.A. § 6672 for 2Q 2003 | 04/03/2006 | $825,954.66 |

(*See* Darmstadter Decl. Ex. 62-65, Certificates of Assessment re: Dan Shaw, ECF No. 88-

67 – 88-70).  The total balance for these assessments, including accrued but un-assessed

penalties and interest as of April 20, 2010 was $3,653,060.67 plus subsequently accruing

interest and penalties. (*See* Kessner Decl. Exs. A-D, INTST Computation re: Dan Shaw

ECF No. 87-1 – 87-4).

## DISCUSSION

**A.    Legal Standard**

The purpose of summary judgment is to avoid unnecessary trials when there is no

dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S.*

*Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Id.* As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

In an action brought to collect federal taxes, the United States bears the initial burden of proof. *Palmer v. U.S. Internal Revenue Service*, 116 F.3d 1309, 1312 (9th Cir. 1997). That burden can be satisfied through introduction of proof of the tax assessments, which are entitled to a presumption of correctness so long as they are supported by a minimal factual foundation. *Id.*; *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079 (1984). Once the tax assessments are established the

burden shifts to the individual against whom the assessment is made to show that he or she is not liable for the assessment. *Oliver v. United States*, 921 F.2d 916 (9th Cir. 1990).

The United States usually satisfies its initial burden through the introduction of Certificates of Assessments and Payments (IRS Forms 4340). *See Koff v. United States*, 3 F.3d 1297, 1298(9th Cir. 1993); *Hughes v. United States*, 953 F.2d 531, 540 (9th Cir. 1992). The Ninth Circuit has repeatedly held that IRS Certificates of Assessments and Payments are "probative of evidence in and of themselves and, in the absence of contrary evidence, are sufficient to establish that notices and assessments were properly made." *Koff* at 1298; *Hughes* at 540. In *Hughes*, the Court found that Certificates of Assessments and payments qualify within the exception to the hearsay evidence rule as public records under Fed. R. Evid. 803(8) and are self-authenticating domestic public documents under Fed. R. Evid. 902 (1). *Hughes*, 953 F.2d at 539–40. Also, the Ninth Circuit and other circuits have held that official computer generated IRS documents (4340 Forms) are admissible as public records. *Id.* at 540. The Supreme Court has held that an assessment for unpaid federal taxes, when properly certified, is presumptively correct evidence of a taxpayer's liability and satisfies the United States' burden of proof so that the United States may rest its case. *United States v. Janis*, 428 U.S. 433, 440–41 (1976). Certificates of Assessments and Payments, in the absence of evidence casting doubt on their accuracy, are sufficient to support a grant of summary judgment on the facts reflected thereon. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

The United States has provided Certificates of Assessments and Payments with this motion for summary judgment. (ECF No. 88-67 – 88-70). These assessments are presumed correct and Mr. Shaw bears the burden of proving 1) that he is not a "responsible person" under section 26 U.S.C.A. 6672, or 2) that he did not "willfully" fail to pay the employment taxes withheld from VSS's employees and held in trust for the

United States. *Oliver*, 921 F.2d at 919–20.

**B.     Trust Fund Penalty Statutory Framework**

Employers must withhold Federal Insurance Contributions Act (FICA) and federal income taxes from employees' wages and periodically remit the amounts withheld to the Internal Revenue Service (IRS). 26 U.S.C.A. § 3101 et seq.; 26 U.S.C.A. § 3401 et seq.; *Davis v. United States*, 961 F.2d 867, 869-70 (9th Cir. 1992); *Bowlen v. United States*, 956 F.2d 723, 726 (7th Cir. 1992).  The taxes that are withheld constitute a special fund which is held in trust by the employer for the United States until they are remitted to the IRS. 26 U.S.C.A. §7501; *Davis*, 961 F.2d at 869.  The amounts withheld are considered more than just a general debt obligation of the business; they are held in trust for the benefit of the United States. *Davis*, 961 F.2d at 869.  Because the funds are held for the exclusive use and benefit of the United States, they may not be diverted to pay other obligations of the business, including net salaries or other operating expenses. *See generally Buffalow v. United States*, 109 F.3d 570 (9th Cir. 1997).

Congress enacted 26 U.S.C.A. 6672 of the Internal Revenue Code to deter persons from misappropriating trust fund taxes in operating their businesses. *Id.*  Section 6672 provides, in pertinent part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C.A. § 6672.  Although denominated a "penalty" in the statute, the liability imposed under section 6672 is not penal in nature, but rather is a means of ensuring that

the United States is able to recover withholding taxes from a defunct business. *United States v. Pepperman*, 976 F.2d 123, 126 (9th Cir. 1992).

The determination of liability for a penalty under section 6672 involves a two-step inquiry. First, it must be determined whether the individual assessed is a 'responsible person' within the meaning of section 6672. Second, it must be determined whether the responsible person acted 'willfully' in failing to collect or pay over the withheld taxes with the meaning of section 6672. *See Davis*, 961 F.2d at 869–70; *Buffalow*, 109 F.3d at 573; *Purcell v. United States*, 1 F.3d 932, 936 (9th Cir. 1993).

**C.    Analysis**

**1.    Whether Dan Shaw is a "Responsible Person" under 26 U.S.C.A. § 6672**

Under section 6672 "responsibility is a matter of status, duty, and authority, not knowledge." *Davis*, 961 F.2d at 873. Authority is based on the "scope and nature" of the person's power to control the corporation's finances. *Purcell*, 1. F.3d at 937. Whether a person is responsible is considered "in light of the person's authority over an enterprise's finances or general decision making." *O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir.1992).

A 'responsible person' need not actually exercise control over corporate affairs, rather it is the mere ability to exercise control that establishes responsibility. *United States v. Jones*, 33 F.3d 1137, 1139 (9th Cir. 1994). "Although an individual's daily functions may be unrelated to financial or tax-related decision-making, that individual may be 'responsible' by having the 'authority to pay or to order the payment of delinquent taxes.'" *Id.* (*citing Purcell*, 1 F.3d at 937). "An individual who does not have the authority and control to pay the payroll taxes may not be responsible." *Id.* "Courts must look beyond official titles to the actual decision-making process." *Id.* (*citing Godfrey v. United States*, 748 F.2d 1568, 1575 (Fed.Cir.1984) (chairman of the board of

directors not liable under section 6672 because there was no evidence that he had or exercised control over collection, accounting for, or payment of taxes)). "[T]he key to liability under section 6672 is the power to control the decision-making process by which the employer corporation allocates funds." *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir.1992).

There are a number of factors to consider in determining whether a party is a 'responsible person' under section 6672. These include the "individual's duties as outlined in the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether he could hire and fire employees." *United States v. Jones*, 33 F.3d 1137, 1140 (9th Cir. 1994) (adopting the Second Circuit's list of factors in *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990)). "The most critical factor [is] having 'significant control over the enterprise's finances.'" *Id.*

VSS adopted an Operating Agreement which was signed by its members, Mr. Villamor, Mr. Shaw and Mr. Schatzman, in October 1999. (*See* Darmstadter Decl. Ex. 11, Operating Agreement, ECF No. 80-14). This was amended and the First Amended Restated Operating Agreement ("AOP") was in effect for the period from March 2000 to 2004. (*See* Darmstadter Decl. Ex. 15, AOP, ECF No. 88-18; Darmstadter Decl. Ex. 12, Schatzman Dep. p. 68, ECF No. 88-15; Shaw Dep. p. 74). VSS failed to remit its taxes to the IRS for the period from July 1, 2002 through June 30, 2003. Therefore, it is this AOP which is applicable to the issue. From this AOP it appears that Shaw had 60% ownership interest, Villamor had 25% and Schatzman had 15%. (AOP at A-1).

The United States argues that as the principal owner and manager of an entity, Mr. Shaw is presumed to be a 'responsible person' under section 6672. *See Denbo v. United States*, 988 F.2d 1029 (10th Cir. 1993); *Larson v. United States*, 76 F.Supp.2d 1092, 1096 (E.D. Wash. 2000); *Feist v. United States*, 607 F.2d 954 (Ct.Cl. 1979). The United States

alleges that Mr. Shaw was the controlling member manager of VSS during the time period when employment taxes went unpaid. Furthermore, pursuant to the AOP, Mr. Shaw had the right to remove any manager or officer and to approve all major financial decisions. As the manager with majority ownership interest, Mr. Shaw had plenary power over all major decisions. Most importantly, pursuant to the express terms of the AOP, when VSS defaulted on the Shaw Note, Mr. Shaw became the only manager entitled to vote or to act on behalf of the company.

However, Mr. Shaw disputes that VSS was delinquent in the payment of interest owed to him on his loans. Mr. Shaw explains that his notes were subordinate to the VSS note payable to Foothill Capital or the note payable to Vestin Mortgage. According to Mr. Shaw, because his notes were subordinate to the Foothill Capital and Vestin Mortgage notes and the terms and conditions of those loans precluded any payment of interest to Mr. Shaw at times other than limited circumstances, VSS was not delinquent in paying interest on Mr. Shaw's notes. Therefore, Mr. Shaw argues he was not able to exercise control over VSS in the manner described in the AOP. Mr. Shaw testified that he had no duties or authority in management or operation of the Castaways. Mr. Shaw argues that he was an investor in the business endeavor and looked exclusively to Mr. Villamor and his team to manage the operations. The Executive Vice President of Castaways, Mr. Schatzman, testified in his deposition that Mr. Shaw did not have any involvement with the management or operations of the Castaways and that he was a 60% owner in "legal terms" only. (Kelley Decl. Ex. D-1 – D-2, Schatzman Dep. p. 174, 335–36, ECF No. 96-8 –96-9).

This Court finds that whether or not VSS was in default on Mr. Shaw's note is immaterial as the AOP clearly gave Mr. Shaw the authority to see that the payroll taxes were paid under his member manager status. The AOP distinguishes between Members

and Managers. Members are individuals that hold an interest in the company. Mr. Shaw held an interest in VSS and therefore was a Member. However, the AOP also names three Managers, Mr. Schatzman, Mr. Villamor and Mr. Shaw. (AOP section 6.1, p. 12). While it is true that the AOP dictates that if the company was delinquent in the payment of amounts owed to "the Senior Indebtedness" or the Shaw Note, only Mr. Shaw would be entitled to cast a vote or to act on behalf of the company, if the company was not in default, each of the three Managers was still allowed one vote. (*Id.* at section 6.2). All actions of the Managers were required to be approved by the unanimous vote of the three Managers. (*Id.*). If there was any disagreement among the Managers, the subject action would then be submitted to the Members and the decision of the majority Members would be final and binding. (*Id.*). Mr. Shaw held a 60% interest in VSS. Therefore, Mr. Shaw was given authority by the AOP in either scenario because he was both a Manager and a Member with a majority interest.

According to the AOP, managers have the "authority to bind the Company" . . . and "shall have the power… to do all things necessary or convenient to carry out the business and affairs of the Company . . . including: . . .entering into contracts and guaranties; . . . borrowing money, issuance of notes, bonds and other obligations; . . .the appointment of employees and agents of the Company; . . .the payment of compensation, or additional compensation to any or all Members and employees; . . . any other act that furthers the business and affairs of the Company." (*Id.* at section 6.5, p. 12-13.). Even if Mr. Shaw did not actually exercise the powers listed in the AOP, he clearly had the authority to act on behalf of the company in the ways a 'responsible person' under section 6672 would. According to the terms of the AOP, it appears that Mr. Shaw had the ability to take control of the voting requirements and force the other Managers to do what he said because he held a 60% interest in the company.

Mr. Shaw's argument that the AOP was just an agreement on paper that would not bind anyone is unpersuasive. Mr. Shaw argues that Mr. Villamor and Mr. Schatzman testified that they did not follow the AOP. (Villamor Dep. p. 48; Kelley Decl. Ex. D1, Schatzman Dep. p. 141–44, ECF No. 96-8). However, Villamor also testified that he understood that Mr. Shaw had the final authority over major decisions and could, at any time, remove any manager or officer of VSS. (Villamor Dep. p. 48–49). The conflicting testimony of Mr. Villamor does not establish an intent not to be bound by the terms of the AOP among all parties. The AOP is unambiguous and clearly states what Mr. Shaw's authority was. Mr. Shaw's subjective belief that he had no authority under the AOP does not disprove the validity of a contract in this case. *See Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir. 1984) ("[A] party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it."; *see also Operating Engineers Pension Trust v. Cecil Backhoe Service, Inc.*, 795 F.2d 1501, 1505 (9th Cir. 1989)(finding that a party's argument that he was not aware of the legal consequence of signing an agreement is not a valid defense.). Mr. Shaw, Mr. Villamor and Mr. Schatzman all signed the agreement manifesting an objective assent to be bound by the terms of the agreement. The agreement clearly and unambiguously states that the Members agree to the terms and conditions of the AOP. (*See* AOP, section 1.2, p. 1). The enforceability of a contract presents a question of law. *See Local Motion, Inc. v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997). The evidence in this case establishes a valid and enforceable contract as a matter of law. Pursuant to the language of the AOP, Mr. Shaw legally had the ability to conduct business on behalf of the Castaways and override any decision the other two managers made by simply putting it to a vote.

Mr. Shaw's position as the majority shareholder is also significant to his

responsibility under the AOP to pay taxes. The United States argues that the fact that Mr. Shaw was both the majority shareholder and a primary financier for VSS with check signing authority over company accounts is sufficient, as a matter of law, to establish that he was a responsible person for VSS. The United States cites to a similar case from the Eastern District of Washington to support its proposition. In *Larson v. United States*, 76 F.Supp.2d at 1094, the plaintiff, Paul Larson, was never a corporate officer on the board of directors or an employee of the company. Larson was not involved in the day-to-day operations. *Id.* He was a signatory on the corporations' checking accounts but Larson claims he had no authority from the corporation to sign checks. *Id.* Larson was the majority shareholder and primary financier of the closely held corporation. *Id.* The court found that:

> Though not a director or an officer, he had the absolute power as majority shareholder to control all operations of the corporation. When the corporation ran into financial trouble both [the bank] and the IRS looked to Larson . . . to remedy the problem. Twice when the corporation failed to pay its federal taxes, Larson personally borrowed money to infuse into the corporation. Though he chose not to exercise it, Larson had the effective power to ensure that federal taxes were paid. The Court finds this power sufficient to establish that Larson had the duty, authority, and status which render him a responsible person under section 6672.

*Id.* at 1097. Similar to Larson, Mr. Shaw had the "absolute power as majority shareholder to control all operations" of the company. It is of no avail that Mr. Shaw chose not to exercise this power or that the executive team did not follow the AOP.

Mr. Shaw's assertions that he did not have check signing authority, was not a key employee, did not manage day-to-day operations, did not hire or fire employees, did not have an office or regularly attend meetings are not material facts. These facts are not material in light of the authority given to Mr. Shaw under the AOP as the majority

shareholder.

Further, Mr. Shaw's argument that he is similarly situated to the plaintiff in *O'Connor v. United States,* 956 F.2d 48 (4th Cir. 1992) is unpersuasive. Mr. O'Conner, was vice president, a 50% shareholder in the closely held corporation, and had check signing authority. *Id.* at 50, 52. O'Connor did not participate in any of the day-to-day operations and management, he did not control payroll, he did not decide which bills to pay, he drew no salary and he had no office space. *Id.* at 52. O'Connor's equal partner, Voight, exercised the authority to run the business, while O'Connor provided the financial backing. *Id.* In determining that there were genuine issues of material fact concerning O'Connor's authority and use of authority and consequently his status as a responsible person the court reasoned:

> The separation of authority within a business enterprise, and the limitation on authority held by officers is a practical reality which is acknowledged and given effect by the courts. To ignore this reality and rule otherwise would be to envelop within "responsible person" all significant investors with titles in corporations which fail to pay their withholding taxes. By O'Connor's assertions and by inference, the authority to run the business was vested in Voight. O'Connor was a "silent" investor who did not exercise authority and was not under a duty to do so.

*Id.* at 51 (internal citations omitted).

Although Mr. Shaw's situation is very similar to O'Connor's these two cases are distinguishable. In *O'Connor* there was no contractual arrangement in which O'Connor could exercise the authority to step in and control the major decisions of the corporation. All the authority to run the company was 'vested' in O'Connor's partner. However, in this case Mr. Shaw did possess the ability to exercise his position as majority shareholder and see that the taxes were being paid because the AOP gave him the authority to do so. "Authority turns on the scope and nature of individual's power to determine how the

corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid overflows from the authority that enables one to do so." *Purcell*, 1 F.3d at 937. Accordingly, the Court finds that there are no genuine issues of material fact regarding whether Mr. Shaw was a responsible person under section 6672. Mr. Shaw had the status, duty, and authority of a 'responsible person.'

### 2. Whether Dan Shaw was "Willful" under 26 U.S.C.A. § 6672

'Willfulness' under section 6672 is a "voluntary, conscious, and intentional act to prefer other creditors over the United States." *Davis*, 961 F.2d at 871 (citations omitted). Intent to defraud the United States or other bad motive need not be established and conduct motivated by reasonable cause may nonetheless be considered willful. *Id.* Furthermore,

> "if a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses, even to meet the payroll out of personal funds he lends the corporation, our precedents require that the failure to pay withholding taxes be deemed "'willful.'"

*Phillips v. U.S. I.R.S.*, 73 F.3d 939, 942 (9th Cir. 1996).

The key determination in considering willfulness is the time at which the responsible person first became aware that the corporation was delinquent in its payroll taxes. *See Davis*, 961 F.2d at 876. The person's actions after he learns of the tax debt are what establish willfulness. *Id.* In this regard, after a responsible person knows of the unpaid tax liability, any money coming into the company, from any source, must be paid to the United States to satisfy both current and accrued taxes. *See Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976); *see also Davis*, 961 F.2d at 876 ("'there is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so when there is knowledge of the liability . . .

constitutes willfulness.'" (*quoting Brown v. United States*, 591 F.2d 1136, 1157 (5th Cir. 1979))).

Willfulness can be established in two ways. First, the United States can establish that the responsible person had *actual knowledge* that payroll taxes were not being paid but still made payments to other creditors instead. Second, a responsible person will be deemed willful if he or she acted in *reckless disregard* of whether taxes were being paid. *See Phillips*, 73 F.3d at 942.

### a.    Actual Knowledge of Tax Delinquency

The United States argues that Mr. Shaw possessed *actual knowledge* of the tax delinquency in August of 2002. Mr. Villamor testified at his deposition that as a matter of course he would have advised Mr. Shaw of the delinquency as soon as he learned of the issue in August 2002. (Villamor Dep. pp. 241–42, 336–37, 343–44.) Mr. Shaw's recollection of when he learned of the tax delinquency has changed over time.

In 2003, Mr. Shaw was initially deposed in connection with VSS's bankruptcy proceedings. At that time Mr. Shaw testified that he learned of the unpaid taxes at a weekly meeting sometime in 2002. (Shaw BK Dep. pp. 94–96). In that deposition Mr. Shaw stated that the employment taxes were not paid due to a lack of operating funds, and that VSS's management made a decision that the taxes would not be paid until sufficient cash was available. (*Id.*). However, at Mr. Shaw's later deposition for this case, Mr. Shaw testified that he learned that VSS was not paying the taxes in February or March of 2003 when Mr. Villamor apprised him of the payroll tax delinquency. (Shaw Dep. pp. 152-155). The United States argues that Mr. Shaw cannot create a genuine issue of material fact by contradicting his own prior deposition testimony.

Mr. Shaw argues that the United States is not presenting the full picture in its argument. Mr. Shaw explains that he is not the only person to give inconsistent

statements about when he learned of the tax delinquency. Also, if one reviews all of Mr. Shaw's testimony in the bankruptcy case one will see that when first asked when he learned of the unpaid taxes he testified that he did not recall. Only later after further questioning did Mr. Shaw testify that he believed he learned of the unpaid taxes in 2002.

Mr. Shaw further argues that a close review of Mr. Villamor's testimony is equally unclear. Mr. Shaw proffers that Mr. Villamor did not affirmatively state that he told Mr. Shaw of the delinquency; he said only that it is the kind of thing he would have told Mr. Shaw. (Villamor Dep. pp. 241–42, 336–37, 343–44). Mr. Shaw also argues that Mr. Schatzman's testimony shows that Mr. Shaw did not know until at least December 2, 2002. Mr. Schatzman was directly involved in the management and operations of the Castaways but did not learn of the tax delinquency himself until December 2, 2002. (Kelly Decl. Schatzman Dep. Ex. D-1 pp. 152; ECF No. 96-8). He testified that when he discussed the issue with Mr. Villamor on December 2, 2002, that Mr. Villamor said he would talk to Mr. Shaw about it but he did not know if Mr. Villamor actually spoke to Mr. Shaw about it. (*Id.* at p. 157). Mr. Shaw asserts that given all of the inconsistent deposition testimony from all the witnesses in the case there is a genuine issue of material fact regarding when he first learned of the tax delinquency.

The Ninth Circuit has found that the contradiction of prior, sworn testimony through subsequent sworn testimony cannot create a genuine fact issue. *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). Further, the Ninth Circuit is clear that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975). However, the court must make a factual determination if the contradiction was

actually a sham. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).

Mr. Shaw's earlier deposition in the bankruptcy proceeding took place on July 8, 2003. At that deposition he testified that he learned the payroll taxes were not being paid sometime in 2002. Later, Mr. Shaw's testimony changed in his 2009 deposition which was taken for this case. Mr. Shaw now claims that he did not know about the bankruptcy taxes being late until either late February 2003 or until as late as June 2003. However, it seems that if Mr. Shaw did not find out about the unpaid taxes until June of 2003, he would have keenly been aware of this just one month later during his July of 2003 deposition. However, that was not Mr. Shaw's testimony in July of 2003. Before stating he learned of the unpaid taxes sometime in 2002, his testimony in July of 2003 was initially that he did not recall.

Finally, Mr. Shaw states in his declaration, filed in June of 2010, that the time period of late 2002 to 2003 was a very busy time in his business life and therefore he was not prepared for the question about when he became aware of the unpaid taxes at the bankruptcy deposition. Then, after time to consider the situation, he can remember that it happened sometime between late February 2003 and a few weeks before VSS filing bankruptcy on June 26, 2003. The court finds it most unlikely that Mr. Shaw has a better recollection of the events after nearly seven years later as opposed to only a few months after they happened.

Nonetheless, the court is still not entirely convinced that Mr. Shaw possessed actual knowledge about the delinquent taxes in 2002 as he testified in his 2003 bankruptcy deposition. The relevant testimony reads:

Q: When did you first become aware that 941 taxes were unpaid?

A: I can't recall.

Q: Would it be the third quarter of 2002?

A: Again, I don't recall.

Q: When did you first become aware that 941 taxes were unpaid?

A: In one of our regular management meetings.

. . .

Q: Was he seeking direction as to whether to pay payroll taxes?

A: I don't recall what that discussion was.

Q: Did that discussion occur in 2002?

A: I believe that it did, yes.

(Shaw BK Dep. p. 94-95). This testimony is far from convincing that Mr. Shaw knew that the taxes were being unpaid in 2002.

Furthermore, the remaining evidence presented does not clearly demonstrate when Mr. Shaw became aware of the unpaid taxes. While Mr. Villamor's testimony that as a matter of course he would have advised Mr. Shaw of the delinquency as soon as he learned of the issue in August 2002 makes it more likely than not that Shaw knew, it does not definitively prove that Mr. Shaw possessed actual knowledge in 2002. Also, Mr. Schatzman's testimony that he did not learn of the tax delinquency until December 2002 does nothing to help or hurt Mr. Shaw, because Mr. Schatzman's testimony relates only to when he learned of the tax delinquencies and does not equivocally state that Mr. Shaw did not know. Nonetheless, Mr. Schatzman's testimony shows that some of the members of the organization already knew of the tax delinquency before he became aware of it in December of 2002.

Thus there is a genuine issue of material fact regarding when Mr. Shaw learned of and actually knew the payroll taxes were not being paid. There is no issue regarding whether Mr. Shaw knew before the bankruptcy that payroll taxes were delinquent; the only question is how long before the bankruptcy did he know. Determining when Mr.

Shaw discovered the delinquency is material because whatever actions, or inactions, he took following this discovery will determine if Mr. Shaw was willful.

### b. Reckless Disregard

Even if Mr. Shaw did not have *actual knowledge* of the tax delinquency he can still be found willful if he acted in *reckless disregard* of whether the taxes were being paid. *Phillips*, 73 F.3d at 942 ("'[R]eckless disregard' of whether the taxes are being paid [], as distinguished from actual knowledge of whether they are being paid [], may suffice to establish willfulness."). A responsible person is liable if he "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Id.* at 943.

In the *Phillips* case, Wray was the owner and president of an Airline. *Id.* Prior to the trust fund tax delinquency, Wray had been paralyzed from the neck down in a swimming accident and the FAA required Wray to resign his corporate offices in an unrelated matter. *Id.* at 940. However, Wray maintained ownership of the company and check signing authority over the corporate bank account but he delegated the day-to-day operational control to Phillips. *Id.* While Wray was confined to his apartment and Phillips was running the company, the corporation failed to pay employment taxes. *Id.* at 940–41. Both Wray and Phillips were assessed with responsible person penalties, and at trial, the jury found Wray liable under section 6672. *Id.* at 941. On appeal the court found that even if the jury believed that Wray did not have actual knowledge of the delinquency, he was still liable because of his affirmative failure to ascertain whether the payroll taxes were being paid. *Id.* at 943.

The United States argues that similar to Wray in *Phillips*, Mr. Shaw should be found liable because he recklessly disregarded the fact that the payroll taxes went unpaid. Mr. Shaw had complete access to all of the financial books and records of VSS. Further,

Mr. Shaw was provided at least monthly detailed and comprehensive financial statements which reflected the payroll tax debt. Moreover, Mr. Shaw was acutely aware of VSS's financial problems as he was providing short-term loans in excess of $1.2 million during 2003. Therefore, even if Mr. Shaw asserts that he was unaware of the tax delinquency since he had actual knowledge of VSS's cash flow problems he should have known that there was a grave risk that VSS was not paying its payroll taxes, and easily could have found out had he tried.

Mr. Shaw argues that the he did not regularly attend meetings and that the monthly financial statements were very complicated. Mr. Shaw asserts that someone without training, experience, or expertise in accounting or reviewing complex financial report packages would not be able to identify what entry shows the delinquent payroll taxes. Mr. Shaw argues that to understand the report he would need specific direction from someone like Mr. O'Brien or Mr. VanWoerkom as to what entries were relevant and important. Mr. Shaw argues that these create genuine issues pertaining to whether or not he acted in reckless disregard to the unpaid taxes.

The court finds that there are many differences between the instant case and *Phillips*. The jury in *Phillips* was presented with facts that Wray knew employees were being paid but no flights for hire were being made, that his long time aide had let the taxes go unpaid once before and that he was approving which bills were to be paid. The court, affirming the jury's finding, found that it is reasonable to conclude from this evidence that Wray had a duty to inquire if the taxes were being paid, and since he failed to do so he recklessly disregarded his tax responsibility.

In the instant case, Mr. Shaw was not involved in the payroll or issuing checks to creditors. There is a genuine dispute as to whether he regularly attended meetings where the issue of paying taxes would have been discussed. Also, Mr. Shaw had a history of

loaning money to the corporation. Based on Mr. Shaw's history of loaning money there is no evidence that he would have denied VSS the money to pay the tax delinquency if requested. He could have merely thought that he was lending the money to VSS so that it could meet all of its financial obligations, including its federal tax obligations.

The United States also argues that Mr. Shaw is willful under section 6672 because once he learned of the delinquency he undertook no efforts to investigate or correct the mismanagement that led to the nonpayment of federal payroll taxes to the United States. According to Mr. Shaw's testimony he "considered it a serious situation," and asked Mr. Villamor to correct the situation. However, Mr. Shaw did not take any additional steps or follow up with Mr. Villamor to ensure that the taxes were paid. This failure to investigate or correct the mismanagement of the Castaways, the United States argues, is more than enough to find Mr. Shaw willful under section 6672. While the Court agrees that this is a very persuasive argument which is most likely to lead to a jury finding that Mr. Shaw was willful, it also recognizes that the important question of when Mr. Shaw learned of the delinquent taxes remains unclear. Accordingly, summary judgment cannot be granted under this theory.

Although Mr. Shaw is a 'responsible person' under section 6672, he did not appear to have as much control over the finances as Wray did in the *Phillips* case. Therefore, a question of fact still remains as to the issue of whether Mr. Shaw was willful and based upon the evidence presented thus far, reasonable minds could differ as to the conclusion to be reached regarding his willfulness. At trial, the parties will need to present additional testimonial evidence to enable the Court to determine when Mr. Shaw had *actual knowledge* of the tax delinquency. Alternatively, to determine if Mr. Shaw acted in *reckless disregard,* the parties will need to focus on when Mr. Shaw ought to have known about it. The Court will determine the credibility of the witnesses and will

also consider their statements in light of Mr. Shaw's access to the accounting/financial statements and other business records, how often he generally attended relevant meetings, and/or received other similar communications in order to determine what information Mr. Shaw received about the Castaway's financial situation and when he actually knew or should have known about the tax delinquency.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that the Court **GRANTS in part** and **DENIES in part** the United States' Motion for Summary Judgment.

The Court finds that Mr. Shaw is a 'responsible person' as defined under section 6672 as a matter of law.

However, there are genuine issues of material fact regarding whether Mr. Shaw was 'willful' under section 6672. That will need to be determined at trial.

Further, any remaining claims and counterclaims will be determined at trial.

DATED this 9th day of March, 2011.

_____
Gloria M. Navarro
United States District Judge